**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| TYSON O.,[1]<br><br>Plaintiff,<br>vs.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | Case No. 3:25-cv-00270-ACP |

**DECISION AND ORDER**

On or about January 17, 2023, Tyson O. ("Plaintiff") protectively filed an application under Title II of the Social Security Act,[2] with an amended alleged onset date of January 17, 2022.[3] Plaintiff was 50 years old at the time of his application and previously worked as an industrial truck mechanic and fast food cashier.[4]

Plaintiff exhausted his remedies and timely appealed to this Court on October 9, 2025.[5] Plaintiff's Opening Brief asks the Court to reverse the Commissioner's decision

[1] Plaintiff's name is partially redacted in accordance with Fed. R. Civ. P. 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time. Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income. Plaintiff brings claims under Title II only. Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs. *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI). For convenience, the Court cites the regulations governing disability determinations under both titles.

[3] Administrative Record ("A.R.") 189. Plaintiff amended his alleged onset date from January 1, 2022, to January 17, 2022, at the hearing before the ALJ. A.R. 38.

[4] A.R. 26, 189, 234.

[5] Docket 1.

and remand for the payment of benefits or, in the alternative, remand for further proceedings under sentence four of 42 U.S.C. § 405(g).[6] The Commissioner filed the Administrative Record as his Answer and a Response Brief.[7] Plaintiff filed a Reply Brief.[8] For the reasons discussed below, Plaintiff's request for relief at Docket 12 is GRANTED.

## STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it either is not supported by substantial evidence or is based upon legal error.[9] "Substantial evidence" has been defined by the Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10] Such evidence must be "more than a mere scintilla but not necessarily a preponderance."[11] In reviewing the agency's determination, a court "considers the evidence in its entirety, weighing both the evidence that supports and that detracts from the ALJ's conclusion."[12] "If the evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."[13] A reviewing court may

[6] Docket 12 (Plaintiff's Brief) at 13.

[7] Docket 11 (Notice of Lodging Admin. Record); Docket 13 (Commissioner's Br.). As of December 1, 2022, the Commissioner's "answer may be limited to a certified copy of the administrative record[.]" *See* Fed. R. Civ. P., Supp. R. 4(b) of Soc. Sec. Actions under 42 U.S.C. § 405(g) (effective Dec. 1, 2022).

[8] Docket 14.

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)).

[11] *Connett v. Barnhart,* 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).

[12] *Luther v. Berryhill,* 891 F.3d 872, 875 (9th Cir. 2018).

[13] *Ford v. Saul,* 950 F.3d 1141, 1154 (9th Cir. 2020) (citation and internal quotation omitted).

only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [s]he did not rely."[14] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[15] The ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered . . . even when the claimant is represented by counsel."[16]

**DETERMINING DISABILITY**

The Social Security Act ("the Act") provides for the payment of disability insurance benefits ("DIB") to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[17] In addition, Supplemental Security Income ("SSI") may be available to individuals who do not have insured status under the Act but who are age 65 or older, blind, or disabled.[18] Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

---

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (citation omitted).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotations and citations omitted).

[16] *Celaya v. Halter,* 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)).

[17] 42 U.S.C. § 423(a).

[18] 42 U.S.C. § 1381.

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[19]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[20] A claimant bears the burden of proof at steps one through four to make a prima facie showing of disability.[21] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[22] The Commissioner can meet this burden in two ways: (1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. Part 404, Subpart P, Appendix 2.[23] The steps, and the ALJ's findings in this case (in italics), are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity."[24] *The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2026.*[25] *The ALJ also determined that Plaintiff had not engaged in substantial gainful activity since January 17, 2022, the amended alleged onset date.*[26]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical

---

[19] 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).

[20] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[21] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (citing *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[22] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098.

[23] *Tackett*, 180 F.3d at 1101.

[24] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[25] A.R. 18.

[26] *Id.*

or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.[27] *The ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine; status post left knee ACL reconstruction; right knee osteoarthritis and medial meniscus tear; degenerative joint disease of the shoulders; psoriasis; depression; and attention deficit disorder.*[28]

**Step 3.** Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1, precluding substantial gainful activity. If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step.[29] *The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.*[30]

*The ALJ also evaluated Plaintiff's mental impairments using the "paragraph B" criteria, which are the four broad functional areas in 20 CFR, Part 404, Subpart P, Appendix 1, Section 12.00C. To meet the "paragraph B" criteria, Plaintiff's mental impairments must result in at least two "marked" limitations or one "extreme" limitation in the following areas of functioning: 1) understanding, remembering, or applying*

---

[27] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[28] A.R. 19.

[29] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[30] A.R. 19.

*information; 2) interacting with others; 3) concentrating, persisting, or maintaining pace; or 4) adapting or managing oneself.*[31] *The ALJ determined that Plaintiff had a moderate limitation in interacting with others, but found that Plaintiff had only mild limitations in the other broad areas of functioning.*[32]

Residual Functional Capacity. Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.[33] Once determined, the RFC is used at both step four and step five. An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from his impairments, including impairments that are not severe.[34] *The ALJ determined that Plaintiff had the RFC to perform light work with the following limitations: frequently climbing ramps or stairs, balancing, stooping, kneeling, and crawling; occasionally climbing ladders, ropes, or scaffolds and crouching; occasionally reaching overhead on the right (shoulder level and above).*[35] *The ALJ also limited Plaintiff to simple, routine tasks.*[36]

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do his past relevant work, the claimant is deemed not to be disabled.[37]

---

[31] A.R. 19–20.

[32] A.R. 20.

[33] 20 C.F.R. §§ 404.1545(a), 416.945(a).

[34] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[35] A.R. 20.

[36] *Id.*

[37] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Otherwise, the evaluation process moves to the fifth and final step.[38] *The ALJ determined that Plaintiff was unable to perform any past relevant work.[39]*

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of his age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled.[40] *Based on the vocational expert ("VE")'s testimony, the ALJ determined that there were light work jobs existing in significant numbers in the national economy that Plaintiff could perform, including marker (DOT #209.587-034); sub-assembler (DOT #729.684-054); and storage facility rental clerk (DOT #295.367-026).[41]*

The ALJ concluded that Plaintiff was not disabled, as defined in the Social Security Act, from January 17, 2022, through the date of the ALJ's decision on December 13, 2024.[42]

## DISCUSSION

Plaintiff alleges that the SSA decision should be reversed and remanded for the following reasons: (A) the ALJ failed to include all of Plaintiff's established mental limitations in the RFC; (B) the ALJ failed to include all of Plaintiff's established physical limitations in the RFC; and (C) the ALJ failed to consider all potential 12-month periods

---

[38] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[39] A.R. 26.

[40] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[41] A.R. 26–27.

[42] A.R. 27–28.

of disability.[43] The Commissioner disagrees, and urges the Court to affirm the SSA decision.[44]

### A. Mental Limitations in the RFC

Plaintiff asserts that "the ALJ's RFC finding is inconsistent with the ALJ's own prior finding" that Plaintiff was moderately limited in interacting with others.[45] Specifically, he contends that "[g]iven the presence of the moderate limitation in interacting with others, unless the RFC finding reflects some restriction on the ability to interact with supervisors and coworkers, then that RFC is not reflective of the existence of a severe mental impairment."[46] Plaintiff also alleges that the ALJ failed to include "limited public contact" in the RFC and in the question to the vocational expert.[47] The Commissioner counters that the ALJ was not required to provide a specific limitation for interacting with coworkers and supervisors in the RFC because the ALJ "adopted Dr. Kiehl's conclusions about Plaintiff's mild and moderate limitations by finding that he was able to perform 'simple routine tasks[.]'"[48]

At steps two and three, the "paragraph B" criteria are used to rate the severity of a claimant's mental impairments.[49] A moderate limitation is described in the medical listings

---

43 Docket 12 at 2–12.

44 Docket 13 at 2–8.

45 Docket 12 at 5.

46 *Id.*

47 Docket 12 at 5, n.4.

48 Docket 13 at 3.

49 Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4. SSRs are issued by the Commissioner to clarify the Commissioner's regulations and policies. *Bunnell v. Sullivan*, 947 F.2d 341, 346 n.3 (9th Cir. 1991). Although they do not have the force of law, they are nevertheless given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989); *see Orn v. Astrue*, 495 F.3d

as a "fair" ability to function "independently, appropriately, effectively, and on a sustained basis."[50] At the same time, "a moderate impairment is not the same as no impairment at all[.]"[51]

The RFC assessment requires a more detailed explanation of the mental limitations, considering all of the relevant evidence in the record.[52] However, "a direct translation of the findings for the broad functional areas at step three into the concrete, functional limitations that must be identified in the RFC is untenable."[53]

Here, the ALJ found Plaintiff's depression and attention deficit disorder "severe" at step two in the sequential evaluation.[54] At step three, the ALJ considered the four broad

---

625, 636 (9th Cir. 2007) (Social Security Rulings are "binding on all components of the Social Security Administration, . . . and are to be relied upon as precedents in adjudicating cases.").

[50] *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Sec. 12.00F (describing use of a rating scale with paragraph B criteria in evaluating mental disorders).

[51] *See Tianna B. v. Kijakazi,* No. 4:20-cv-5125-EFS, 2022 WL 17224486, at *11 (E.D. Wash. March 15, 2022), *quoting Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007). *But cf. Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021) ("'[F]air' in ordinary usage does not mean 'bad' or 'inadequate.' So a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace.").

[52] 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence); *Robbins v. Soc. Sec. Admin.,* 466 F. 3d 880, 883 (9th Cir. 2006) ("In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'") (quoting SSR 96-8p, 1996 WL 374184, at *5).

[53] *See Garza v. Comm'r of Soc. Sec.,* No. 21-00403, 2022 WL 2974691, at *7 (E.D. Cal. July 27, 2022); *Rounds v. Comm'r of Soc. Sec. Admin.,* 807 F.3d 996, 1006 (9th Cir. 2015) ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC."); *see also Kimball v. Comm'r of Soc. Sec.*, No. 1:21-cv-01548-EPG, 2022 WL 17343820, at *5–6 (E.D. Cal. Nov. 30, 2022) ("While similar evidence may be used in both assessments of Plaintiff's mental impairments, they are distinct, and limitations assessed in the context of the paragraph B assessment are not necessarily transferable to the more detailed assessment required when formulating the RFC. The ALJ's task when assessing the RFC is not to provide an adequate explanation for how the RFC accommodates the ALJ's paragraph B findings, but rather to perform a new, more detailed assessment incorporating all the relevant evidence.").

[54] A.R. 19.

functional areas of mental functioning under the "paragraph B" criteria and found that Plaintiff's ability to interact with others was moderately limited.[55] The ALJ limited Plaintiff to "simple routine tasks" in the RFC.[56]

In his step three analysis, the ALJ noted that, although Plaintiff "tends to avoid social situations and activities," he is able to "interact appropriately with others the greater part of time when necessary."[57] The ALJ also cited evidence from the record to show that "[a]lthough [Plaintiff's] chronic pain and variable mood affects his functioning at times, there is no evidence that he is unable to adequately regulate his emotions" or control his behavior.[58]

Plaintiff alleges that this case is analogous to *K.L.J. v. Commissioner, Social Security Administration,*[59] a district court case from the 10th Circuit.[60] In that case, the district court in Colorado found that "the ALJ did not consider the effect of [the plaintiff]'s moderate limitations on the RFC" and remanded.[61] Specifically, the Colorado district court held that the ALJ did not adequately consider the plaintiff's moderate mental limitations in concentration, persistence, and maintaining pace by including a restriction

---

[55] A.R. 20.

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] 809 F. Supp. 3d 1301, 1309 (D. Colo. Nov. 7, 2025).

[60] Docket 12 at 5.

[61] *K.L.J.,* 809 F. Supp. 3d at 1306.

to unskilled work in the RFC.[62] But, the Colorado court did not hold that all moderate mental limitations must appear as a specific limitation in the RFC.[63]

This Court also declines to adopt such a *per se* rule.[64] Moderate limitations from the paragraph B criteria are adequately translated into an RFC limitation if they are supported by the medical evidence.[65] Moreover, courts in the Ninth Circuit are split on whether an RFC limiting a claimant to simple, routine tasks adequately addresses all moderate social limitations.[66] Therefore, the Court will review the ALJ's RFC evaluation, including Plaintiff's symptom testimony and reports and the administrative medical findings regarding Plaintiff's mental impairments.

**1. Plaintiff's symptom testimony and reports**

As part of the RFC evaluation, the ALJ discounted Plaintiff's symptom testimony regarding his mental impairments for the following reasons: (1) Plaintiff's depression and chronic pain symptoms improved with medication and regular therapy; (2) Plaintiff did not

---

[62] *Id.* at 1308.

[63] *K.L.J.,* 809 F. Supp. 3d at 1301–09.

[64] *Garza,* 2022 WL 2974691, at *7 ("[T]o evaluate whether the ALJ properly encompassed certain paragraph B criteria limitations into the RFC determination, the Court must examine the challenged limitations within the context of the entire RFC determination and the ALJ's evaluation of the medical evidence in this case, rather than applying a *per se* rule.").

[65] *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) ("[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony."); *see also, e.g., Israel v. Astrue*, 494 F. App'x 794, 796 (9th Cir. 2012) (ALJ properly translated moderate limitations into concrete restriction in RFC by drawing on restrictions identified in the medical testimony); *Rogers v. Comm'r of Soc. Sec. Admin.*, 490 Fed. App'x. 15, 17–18 (9th Cir. 2012) (The Ninth Circuit held that the claimant's limitations were adequately captured in the RFC determination because it was consistent with the limitations in work-related abilities identified by the medical opinions in the record) (citing *Stubbs-Danielson*, 539 F.3d at 1174).

[66] *Garza,* 2022 WL 2974691, at *9–10 (collecting cases); *cf. Ramirz v. Kijakazi,* No. 1:22-cv-00445-GSA, 2023 WL 4409853, at *4–5 (E.D. Cal. July 7, 2023) (collecting cases).

always take the prescribed doses of medication; and (3) the mental examinations in the record were "grossly within normal limits."[67]

In evaluating a claimant's subjective symptom complaints, an ALJ must consider the entire record, including (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) medications taken and their effectiveness; (5) treatment other than medication; (6) measures other than treatment used to relieve pain or other symptoms; and (7) "[o]ther factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."[68] If substantial evidence supports the ALJ's determination, it must be upheld, even if some of the reasons cited by the ALJ are not correct.[69]

The ALJ's assessment has two steps.[70] First, the ALJ determines whether the claimant has presented "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[71] In the first step, the claimant need not "show that [his] impairment could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom. Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof."[72]

---

[67] A.R. 23–24.

[68] 20 C.F.R. § 404.1529(c)(3).

[69] *Carmickle v. Comm'r of Soc. Sec.,* 533 F.3d 1155, 1162 (9th Cir. 2008).

[70] *Ferguson v. O'Malley,* 95 F. 4th 1194, 1199 (9th Cir. Mar. 14, 2024).

[71] *Id.* (quoting *Garrison,* 759 F.3d at 1014).

[72] *Garrison,* 759 F.3d at 1014 (citations and quotations omitted).

Second, if the claimant has satisfied step one and the ALJ has determined that the claimant is not malingering, the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms. This standard is "the most demanding required in Social Security cases."[73] Yet, this does not mean an ALJ must "simply accept a claimant's subjective symptom testimony notwithstanding inconsistencies between that testimony and the other objective medical evidence in the record, allowing a claimant's subjective evidence to effectively trump all other evidence in a case."[74]

*a. Effectiveness of medication and conservative treatment*

The effectiveness of medication and other conservative treatments is relevant to the ALJ's evaluation of a claimant's symptom complaints.[75] And "[i]mpairments that can be controlled effectively with medication are not disabling."[76] Here, the ALJ pointed out that Plaintiff's depression and chronic pain improved after providers added medication in May 2022.[77] The ALJ also noted that Plaintiff regularly attended behavioral therapy sessions through the date of the November 2024 hearing.[78] Although Plaintiff also reported he felt increased depression and anger, there is substantial evidence in the treatment record to support the ALJ's reasoning.[79]

---

73 *Ferguson,* 95 F.4th at 1199 (citation omitted).

74 *Smartt v. Kijakazi,* 53 F. 4th 489, 499 (9th Cir. 2022).

75 20 C.F.R. § 404.1529(c)(3).

76 *Warre v. Astrue,* 439 F.3d 1001, 1006 (9th Cir. 2006).

77 A.R. 23.

78 A.R. 24.

79 *See, e.g.,* A.R. 500 (depression improved since stopping Strattera), 502 (depression under control), 513, 607, 680, 693, 700 (denies symptoms of depression or anxiety, 535 (no depressive

*b. Following prescribed course of treatment*

The ALJ discounted Plaintiff's mental health symptom reports because Plaintiff "admitted that he did not always take the dose prescribed."[80] A failure to follow a prescribed course of treatment may constitute a clear and convincing reason to discredit a claimant's subjective symptom complaints.[81] However, in this case, it appears the ALJ's conclusion was derived from only one medical record. In that record, Plaintiff reported splitting a 10 mg dose of Adderall to 5mg "first thing" in the morning and 5mg later in the morning.[82] The ALJ did not address Plaintiff's report to his provider that the Adderall "initially hype[d] him up" at the 10mg dose, but on the split dose he was able to "concentrate much better" and he maintained a "stable" mood.[83] Accordingly, the ALJ's discounting of Plaintiff's mental health symptom reports due to a failure to take medication as prescribed is not a clear and convincing reason, nor is it supported by substantial evidence.

---

manifestations), 572 (depression is stable), 664 (acknowledgement of the progress he has made in his life managing his depressive and anxiety symptoms), 665 (feeling "okay"), 666 (up and down moods), 669 (denies symptoms of depression or anxiety), 671 (feeling "okay"), 683 (improved mood, but lack of motivation and chronic pain), 943 (feeling "good"), 947 (moods not as labile on Seroquel), 1082 (mood more stable after stopped drinking energy drink and able to handle stressful circumstances), 1301 (mood "okay," frustrated," and "trying to take care of himself with what he has and what is within his control"); *but see, e.g.,* A.R. 498, 614, 617, 625, 629, 652, 929, 932, 940, 954, 959, 966, 975 (feeling increased depression and anger regarding the financial difficulties due to not being able to work as a result of his inability to focus, physical limitations, and interactions with others), 887, 896 (chronic pain contributing to depression), 922 (experiencing depression).

[80] A.R. 23.

[81] *Orn,* 495 F.3d at 638 (internal citation omitted).

[82] A.R. 513.

[83] *Id.*

*c. Normal mental examinations*

The ALJ also discounted Plaintiff's mental health symptoms because Plaintiff's mental status examinations were "grossly within normal limits."[84] "When objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony."[85] However, "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity" of the claimant's symptoms.[86] Here, the ALJ reasoned that, "although [Plaintiff] occasionally presented with depressed mood and constricted affect, he was routinely noted as alert, cooperative, and fully oriented with non-pressured speech, good attention, intact memory, logical though process, future-oriented thought content, appropriate responses to verbal and tactile stimuli, and fair insight and judgment."[87] The ALJ also noted Plaintiff's own testimony at the November 2024 hearing that he attended regular telephone therapy sessions.[88] As a whole, the medical record supports this reasoning.[89]

---

[84] A.R. 23.

[85] *Smartt,* 53 F.4th at 498 (emphasis in original).

[86] *Smartt,* 53 F.4th at 494–95 (citing *Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir. 2005) (internal quotations omitted)).

[87] A.R. 23.

[88] A.R. 24.

[89] *See, e.g.,* A.R. 365, 368, 374, 379, 381, 385, 390, 396, 729, 735, 822, 886, 889, 903, 905, 909, 917, 925, 928–29, 931–32, 939, 943, 953, 958, 974, 1070, 1075, 1082, 1086, 1088, 1110, 1116–17, 1200, 1204, 1243, 1250, 1261, 1264, 1284, 1297, 1301; *but see* A.R. 643 (Plaintiff appeared "very angry" and "came to the clinic to express his anger and disappointment"), 695 ("anxious affect and appearance"), 818 (flat affect and "reticent regarding responses to questions regarding his current health condition" after provider denied oxycontin), 1092 (16 days after surgery, Plaintiff reported feeling down, depressed, hopeless over past month, but seeing psychologist), 1228 (increasingly antagonistic during discussion).

In sum, the ALJ provided two clear and convincing reasons, supported by substantial evidence, for discounting Plaintiff's symptom reports regarding his depression and attention deficit disorder. To the extent the ALJ's third reason was in error, such error is harmless.[90]

**2. Medical opinion evidence**

Because Plaintiff filed his application on or about January 16, 2023, the ALJ was required to consider the medical opinions in the record pursuant to 20 C.F.R. § 404.1520c, the revised regulations in effect March 27, 2017.[91]

Under the revised regulations, the ALJ no longer gives any particular weight to a medical opinion based on its source, thereby eliminating the treating source rule.[92] Instead, the ALJ considers the persuasiveness of a medical opinion based on five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length, extent, purpose and extent, and type of treatment; (4) specialization; and (5) other relevant factors that support or contradict the medical opinion.[93]

Supportability and consistency are considered the most important factors for evaluating persuasiveness.[94] Generally, these are the only two factors the ALJ is required

---

90 *Brown-Hunter,* 806 F.3d at 492.

91 *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 82 Fed. Reg. 5844-01 (Jan. 18, 2017), 2017 WL 168819, at *5867–68; 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (for claims filed on or after March 27, 2017).

92 *Woods v. Kijakazi,* 32 F.4th 785, 791 (9th Cir. 2022) ("Under the revised regulations, 'there is not an inherent persuasiveness to evidence from [government consultants] over [a claimant's] own medical source(s), and vice versa.'") (citing *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 82 Fed. Reg. at 5844).

93 20 C.F.R. §§ 404.1520c(c), 416.920c(c).

94 The regulations state, "The factors of supportability . . . and consistency . . . are the most important factors [the SSA] consider[s] when [the SSA] determine[s] how persuasive [the SSA]

to address in the decision.[95] Supportability and consistency are explained as follows in the regulations:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.[96]

Here, the ALJ evaluated the opinion evidence and found state agency reviewing physician Royal Kiehl, M.D.'s administrative medical finding persuasive.[97] Dr. Kiehl rendered his medical opinion on May 28, 2024.[98] Dr. Kiehl reviewed the mental health records from November 2022 through April 2024 and concluded that Plaintiff's ability to interact with others was moderately limited.[99] Dr. Kiehl did not include any social interaction limitations in the RFC, determining that Plaintiff could "interact adequately with coworkers and supervisors."[100] The ALJ reasoned that Dr. Kiehl's opinion was supported by a thorough review of the record, Dr. Kiehl's medical expertise, and his familiarity with

---

find[s] a medical source's medical opinions or prior administrative medical findings to be." 20 C.F.R. §§ 404.1520c(b)(2) (for claims filed on or after March 27, 2017).

[95] 20 C.F.R. §§ 404.1520c(b)(2) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.").

[96] 20 C.F.R. §§ 404.1520c(c)(1)-(2).

[97] A.R. 25.

[98] A.R. 85.

[99] A.R. 84–85.

[100] A.R. 25.

the Social Security regulations.[101] As the ALJ indicated, there are notations in the record demonstrating Plaintiff's impatience and frustration with pain and with the medical system.[102] However, the record as a whole shows grossly normal mental status examinations and Plaintiff's continued management of his mental symptoms through behavioral therapy.[103] The ALJ did not err in finding Dr. Kiehl's administrative medical finding persuasive.

Next, the ALJ discounted the administrative medical finding of the state agency reviewing physician, Ron Feigin, M.D. On September 5, 2023, Dr. Feigin opined that Plaintiff was limited to "brief and structured interactions with coworkers," could "accept supervision if delivered in a clear direct manner," and could "tolerate and manage brief cursory contacts with the public."[104] He evaluated the medical record through September 17, 2023.[105] The ALJ rejected Dr. Feigin's social limitations as unsupported by the medical evidence developed after the initial agency review and determination.[106] There is substantial evidence in the record to support the ALJ's reasoning.[107]

---

[101] *Id*.

[102] *See, e.g.,* A.R. 643 (Plaintiff appeared "very angry" and "came to the clinic to express his anger and disappointment"), 695 ("anxious affect and appearance"), 818 (flat affect and "reticent regarding responses to questions regarding his current health condition" after provider denied oxycontin), 1092 (16 days after surgery, Plaintiff reported feeling down, depressed, hopeless over past month, but seeing psychologist), 1142 ("Discussed [Plaintiff's] underlying rage and anger issues which keep getting him banned from medical offices and the need to get this under control), 1150 (Plaintiff did not want to discuss "any other options for pain medication and walked out of the exam room"), 1228 (increasingly antagonistic during discussion).

[103] A.R. 25. *See supra,* n.89.

[104] A.R. 73.

[105] A.R. 63–65.

[106] A.R. 25.

[107] *See supra*, n.89.

Consequently, the ALJ did not err in finding Dr. Feigin's mental health findings unpersuasive.

Moreover, two of the representative jobs named by the VE at step five, marker (DOT #209.587-034 with 153,000 jobs) and sub-assembler (DOT #729.684-054 with 13,000 jobs), do not require significant interaction with other people or talking and listening.[108] The third occupation, storage-facility rental clerk (DOT # 295.367-026) does require some interaction with coworkers and others.[109] However, even if the storage-facility rental clerk job is eliminated, the total number of jobs available (166,000 between marker and sub-assembler) still may be considered significant in the national economy.[110]

For these reasons, the ALJ did not err by limiting Plaintiff to simple routine tasks.

### B. Physical Limitations in the RFC

Plaintiff makes several allegations regarding his physical limitations in the RFC: (1) the ALJ failed to include any environmental limitations in the RFC, despite finding that Plaintiff required environmental limitations due to his physical impairments; (2) the ALJ failed to include any limitations for Plaintiff's severe degenerative disc disease of the cervical spine, severe psoriasis, or severe degenerative joint disease of the bilateral shoulders; (3) the ALJ failed to resolve the apparent conflict between the Dictionary of Occupational Titles ("DOT") and the VE testimony regarding Plaintiff's shoulder impairment; and (4) the ALJ failed to account for all 12-month disability periods.

---

[108] DICOT 209.587-034, 1991 WL 671802 (Marker), DICOT 729.684-054, 1991 WL 679729 (Sub-Assembler).

[109] DICOT 295.367-026, 1991 WL 672594 (Storage Facility Rental Clerk).

[110] *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) ("A finding of 25,000 jobs likely does not fall into the category of 'isolated jobs' existing in 'very limited numbers.'") (quoting 20 C.F.R. § 416.996(b)).

### 1. Environmental limitations

Plaintiff alleges that the ALJ failed to include any environmental limitations in the RFC despite finding the state agency physician, Mignon Benjamin, M.D.'s medical opinion persuasive.[111] The Commissioner counters that the ALJ's reference to environmental limitations was a typographical error because Dr. Benjamin's administrative medical finding states that Plaintiff does not require environmental limitations.[112] The Commissioner also asserts that Plaintiff "points to no medical evidence suggesting that he had environmental limitations[.]"[113]

The RFC does not include environmental limitations.[114] In the ALJ's explanation, she stated the following:

> Dr. Benjamin opined the claimant could perform light work (lift and carry 20 pounds occasionally and 10 pounds frequently, stand/walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday) with frequent balancing, stooping, kneeling, crawling, and climbing ramps and stairs, occasional crouching and climbing ladders, ropes, or scaffolds, and occasional right overhead reaching. . . . [Dr. Benjamin's opinion] [is] supported by [his] thorough review of the record, medical expertise, and familiarity with the Social Security regulations. [The opinion is] also supported by the cited evidence of only mild to moderate spinal and knee findings . . ., which render the claimant unable to perform more than light work with postural *and environmental limitations* . . . [.][115]

---

[111] Docket 12 at 7.

[112] Docket 13 at 6–7.

[113] Docket 13 at 7.

[114] A.R. 20.

[115] A.R. 25 (emphasis added).

However, Dr. Benjamin did not opine that Plaintiff required environmental limitations. In his administrative medical finding, Dr. Benjamin affirmatively answered "No" to the question, "Does the individual have environmental limitations?".[116]

In reply, Plaintiff calls attention to Dr. Feigin's initial finding that Plaintiff should avoid concentrated exposure to wetness, vibration, and hazards.[117] But the ALJ found Dr. Feigin's opinion regarding Plaintiff's physical impairments "unpersuasive."[118] Therefore, Dr. Feigin's opinion that Plaintiff should avoid concentrated exposure to wetness, vibration, and hazards was not credited by the ALJ and not required to be included in the RFC.[119] Moreover, Plaintiff does not challenge the ALJ's rejection of Dr. Feigin's medical opinion regarding Plaintiff's physical impairments and the representative jobs named by the vocational expert do not appear to require environmental limitations for wetness, vibration, or hazards.[120]

For these reasons, the ALJ did not err in formulating an RFC that did not include environmental limitations.

---

[116] A.R. 87.

[117] Docket 14 at 3; A.R. 71.

[118] A.R. 24–25.

[119] *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d, 1190, 1197 (9th Cir. 2004) (holding that the "ALJ was not required to incorporate evidence from the opinions of [the plaintiff's] treating physicians, which were permissibly discounted," in the ALJ's determination of the RFC).

[120] Docket 12; *see* DICOT 209.587-034, 1991 WL 671802 (Marker), DICOT 729.684-054, 1991 WL 679729 (Sub-Assembler), DICOT 295.367-026, 1991 WL 672594 (Storage Facility Rental Clerk).

### 2. Plaintiff's severe degenerative disc disease of the cervical spine, psoriasis, and bilateral degenerative joint disease of the shoulders

The ALJ discounted Plaintiff's symptom reports and limitations regarding his physical impairments because (1) his reports were out of proportion to the longitudinal observations and findings by providers on physical examinations; (2) they were inconsistent with his reports of activities to providers; and (3) treatment measures successfully improved his symptoms.[121] An ALJ may consider the lack of corroborating objective medical evidence as one factor in "determining the severity of the claimant's pain."[122] The ALJ may not, however, reject subjective testimony solely because it was not fully corroborated by objective medical evidence.[123] In the Ninth Circuit, two grounds have been recognized for using daily activities as a reason to reject a claimant's testimony: (1) the activities contradict the claimant's alleged symptoms; or (2) they meet the threshold for full-time work.[124]

"[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability."[125] However, in the Ninth Circuit, a claimant's "improvement with medication does not necessarily mean he did not experience disabling symptoms prior to

---

[121] A.R. 21–23.

[122] *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

[123] *Robbins*, 466 F.3d at 883; *see also* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) (noting that the Commissioner "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").

[124] *Smith v. Kijakazi,* 14 F.4th 1108, 1114 (9th Cir. 2021) (citing *Orn v. Astrue,* 495 F.3d at 639).

[125] *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017). *See also Kitchen v. Kijakazi*, 82 F.4th 732, 739 (9th Cir. 2023) (holding that the ALJ reasonably discounted the claimant's symptom testimony based on "a gradual improvement in his functioning with prescribed medication and psychotherapy sessions.").

receiving appropriate medication or that he could work before his symptoms stabilized."[126] Relevant factors for the ALJ to consider when evaluating symptom testimony include "[t]he type, dosage, effectiveness, and side effects of any medication" the plaintiff takes to alleviate symptoms, as well as treatment besides medication that relieves symptoms, and other measures used to relieve pain or other symptoms.[127]

*a. Severe degenerative disc disease of the cervical spine*

Plaintiff alleges that the ALJ erred by finding Plaintiff's degenerative disc disease of the cervical spine severe and then failing to include any limitations in the RFC for Plaintiff's decreased range of motion in the neck.[128] The Commissioner asserts that a "severe" limitation at step two does not require the ALJ to include a "corresponding limitation[ ]" in the RFC.[129] The Commissioner further asserts that although Plaintiff relies on his own statements about his symptoms and offers an alternative interpretation of the evidence, he fails to present "credible evidence of the specific limitations for which the ALJ failed to account[.]"[130] In reply, Plaintiff references physical examinations in the record showing "chronically decreased cervical range of motion with tight posterior neck and trapezius muscles and decreased suppleness (muscle spasms)."[131]

Overall, the record supports the limitations provided by the ALJ in the RFC regarding Plaintiff's neck pain. While Plaintiff reported chronic neck pain prior to and

---

[126] *Smith,* 14 F.4th at 1114.

[127] 20 C.F.R. § 404.1529(c)(3)(iv)-(vi).

[128] Docket 12 at 7.

[129] Docket 13 at 7.

[130] *Id.*

[131] Docket 14 at 3–4.

throughout the disability period, there appear to be relatively few records showing decreased range of motion in the neck.[132] For example, in December 2021, Plaintiff reported worsening neck pain, but on physical examination, Plaintiff had full flexion and extension, lacked 10 degrees of lateral bending bilaterally, was tender down to upper thoracic spine, and had symmetrical strength and reflexes.[133] In January 2023, Plaintiff had a normal range of motion in the neck.[134] In February 2023, Plaintiff's provider noted "no worrisome findings on exam" and that Plaintiff experienced moderate relief from ketorolac provided by the clinic.[135] The provider recommended that Plaintiff avoid prolonged sitting or standing.[136] On April 17, 2023, Plaintiff reported an aggravation of his chronic neck pain, but this occurred after "laying on cold ground working on [a] vehicle."[137]

Beginning around June 2023, Plaintiff reported ongoing neck pain.[138] On December 20, 2023, Plaintiff had an MRI of the cervical spine that showed right and left foraminal stenosis at C6-7 and degenerative changes most pronounced at C5-6.[139] On February 12, 2024, Plaintiff underwent an anterior cervical discectomy and fusion and placement of cage at C6-7.[140]

---

[132] *See, e.g.,* A.R. 435, 441, 465, 568, 594, 1034.

[133] A.R. 435.

[134] A.R. 551. *See also, e.g.,* A.R. 719, 724, 729, 735.

[135] A.R. 522.

[136] *Id*.

[137] A.R. 693.

[138] *See, e.g.,* A.R. 718–21, 897, 913, 1030, 1033.

[139] A.R. 1052–53.

[140] A.R. 996–97.


Case 3:25-cv-00270-ACP Document 16 Filed 09/09/26 Page 24 of 35

However, Plaintiff recovered after his neck surgery. For example, on February 22, 2024, Plaintiff reported that he was "happy with his neck surgery."[141] On February 28, 2024, one provider noted that Plaintiff had continued pain in the back of his neck two weeks post-surgery, but also documented that Plaintiff sustained a fall two days after surgery "while lifting a deceased dog over a snowbank" with "no evidence of hardware failure."[142] At the same visit on February 28, 2024, the provider noted that Plaintiff discontinued using his collar four to five days after surgery and opined that Plaintiff should "minimize bending lifting and twisting and he is [to] be limited to 20 to 30 pounds."[143]

On April 22, 2024, Plaintiff reported neck and left shoulder pain, with limited range of motion, but reported that this occurred after falling while stepping from a truck bed to a ladder.[144] And on July 16, 2024, Plaintiff reported 10/10 neck pain that had been worsening over the past two months with decreased range of motion and palpable cervical spine tenderness.[145] However, the X-ray of the cervical spine showed a stable C5-6 and "mild cervical degenerative disc disease."[146]

The ALJ also found that Plaintiff's statements regarding his daily activities were inconsistent with debilitating neck and back impairments.[147] As set forth above, Plaintiff reported lifting a deceased dog only days after his neck surgery.[148] The ALJ also

---

[141] A.R. 1088.

[142] A.R. 1028, 1093.

[143] A.R. 1028–29.

[144] A.R. 1264.

[145] A.R. 1208.

[146] A.R. 1212.

[147] A.R. 22.

[148] A.R. 1028, 1093.

referenced Plaintiff's statement that his back hurt from carpet cleaning for three hours straight and his statement that he continued to be the family member chiefly responsible for household duties.[149]

Other providers' notes also show contradictory activities. For example, in October 2023, Plaintiff reported lower back pain and that he had "been doing quite a bit of labor and thinks he may have overdone it."[150] On April 29, 2022, Plaintiff reported wrist pain after "working in his garage" and "moving [oriented strand board] off the roof."[151] On December 26, 2023, Plaintiff reported that "[h]e is very active, and his knee pain significantly affects his daily activities."[152] On May 23, 2023, Plaintiff reported straining his right shoulder after "throwing logs 2 days ago."[153] On June 20, 2023, Plaintiff reported his activities included "lots of walking and yardwork."[154]

The ALJ also found that Plaintiff recovered "quite nicely" from his neck surgery and sought only conservative treatment, including physical therapy, Prednisone, and anti-inflammatories.[155] There is substantial evidence of this in the record. For example, Plaintiff underwent ACL surgery only six weeks after his neck surgery.[156]

The overall record, Plaintiff's contradictory activities, and the effectiveness of treatment support the ALJ's discounting of Plaintiff's reports of neck pain.

---

[149] *Id.*

[150] A.R. 934.

[151] A.R. 396.

[152] A.R. 1145.

[153] A.R. 669.

[154] A.R. 656.

[155] A.R. 21.

[156] A.R. 1029.

*b. Severe psoriasis*

Plaintiff asserts that, although the ALJ found Plaintiff had severe psoriasis, it was error for the ALJ not to include manipulative or other limitations in the RFC to accommodate Plaintiff's psoriasis on his hands.[157] Plaintiff alleges that this error was not harmless because the three occupations identified by the ALJ at step five require frequent handling.[158]

At his hearing before the ALJ in November 2024, Plaintiff testified that he experienced "[s]ymptoms and scarring from [psoriasis] right now."[159] He testified that his "fingers always crack and the more I use my fingers, the worse they crack."[160] He also testified that a treatment started a few months before the hearing helped clear up his psoriasis, but he also noted that his fingers were still "a constant issue," he continued to experience flare ups, and the monthly injections to treat his psoriasis made him ill for four to five days following a dose.[161]

The ALJ discounted Plaintiff's symptom reports regarding his psoriasis for the stated reason that the treatment measures Plaintiff used "have been generally successful in improving his symptoms."[162] The ALJ noted that Plaintiff's psoriasis symptoms affected his bilateral upper and lower extremities and other areas of his body.[163] The ALJ

[157] Docket 12 at 7.

[158] Docket 12 at 8.

[159] A.R. 42.

[160] *Id.*

[161] A.R. 42–43.

[162] A.R. 23.

[163] *Id.*

discussed the treatment records showing Plaintiff's symptoms were not relieved with Humira or other topical treatments and those showing that when Plaintiff switched to Cosentyx injections in March 2024, Plaintiff's psoriasis began to clear.[164] The ALJ noted that Plaintiff reported "significant clearing and regular injections" by July 2024.[165]

The record shows that Plaintiff reported psoriasis symptoms throughout the disability period and tried multiple topical remedies and other medications before successfully managing his symptoms with Cosentyx.[166] However, the ALJ did not provide a rationale for rejecting Plaintiff's symptom complaints regarding his psoriasis for the period from the alleged onset date of January 17, 2022, to March 2024, the date Plaintiff reported that Cosentyx offered relief of his symptoms.[167] The record also corroborates Plaintiff's symptom testimony regarding Cosentyx's side effects.[168] Plaintiff reported to providers that he was experiencing nausea thought to be related to starting Cosentyx for his psoriasis.[169]

The ALJ's evaluation of Plaintiff's psoriasis is not supported by substantial evidence from the alleged onset date until March 2024, when his providers found an appropriate medication. Because each of the representative occupations at step five

---

[164] *Id.*

[165] *Id.*

[166] *E.g.,* A.R. 396, 502, 559, 582, 585, 590, 592, 607, 609, 621, 641, 693, 700, 702, 707, 710, 889, 947, 1069, 1078, 1135, 1199–1200, 1203–04.

[167] A.R. 22–23.

[168] A.R. 42. *See supra*, n.166.

[169] A.R. 1278.

require frequent handling (existing from 1/3 to 2/3 of the time) and the marker and sub-assembler jobs require frequent fingering, the ALJ's error is not harmless.[170]

*c. Severe bilateral degenerative joint disease of the shoulders*

Plaintiff alleges that the ALJ erred by finding Plaintiff's bilateral degenerative joint disease of the shoulders severe and then limiting overhead reaching only for the right shoulder.[171] He asserts that this error was not harmless because all three of the occupations identified by the ALJ at step five require frequent reaching.[172] Further, Plaintiff claims the ALJ's occasional overhead reaching limitation conflicts with the jobs named by the vocational expert requiring frequent reaching.[173] The Commissioner counters that, in the Ninth Circuit, *no per se* conflict exists between jobs requiring frequent reaching and a limitation on overhead reaching.[174]

The ALJ included a limitation in the RFC for occasional right overhead reaching from shoulder level and above, but the ALJ did not discuss Plaintiff's left shoulder impairment.[175] However, there is evidence in the record that Plaintiff was treated for left shoulder pain radiating from his neck, beginning before the alleged disability period, and underwent additional treatment after he injured his left shoulder falling "from [a] truck bed."[176] The provider documented that Plaintiff's shoulders had full range of motion

[170] DICOT 209.587-034, 1991 WL 671802 (Marker), DICOT 729.684-054, 1991 WL 679729 (Sub-Assembler), DICOT 295.367-026, 1991 WL 672594 (Storage Facility Rental Clerk).

[171] Docket 12 at 8.

[172] *Id.*

[173] *Id.*

[174] Docket 13 at 5–6.

[175] A.R. 20.

[176] A.R. 359, 363, 367, 372, 475, 1214, 1256.

actively with difficulty, but abduction against resistance brought Plaintiff "to tears."[177] Plaintiff reported in August 2024 that he had been unable to get an MRI for his left shoulder impairment due to "financial and travel restrictions."[178]

From the Court's review, it is unclear whether the ALJ intended to discount Plaintiff's testimony regarding his left shoulder impairment or merely ignored it. In the Ninth Circuit, it is error for an ALJ to ignore medical evidence.[179] Because the ALJ did not provide any explanation for discounting Plaintiff's testimony regarding his left shoulder, the ALJ erred. This error is not harmless because the hypothetical question presented to the vocational expert did not include any limitations involving the left shoulder.[180]

**3. The apparent conflict between the Dictionary of Occupational Titles ("DOT") and the VE testimony regarding Plaintiff's shoulder impairment**

Plaintiff alleges that the ALJ did not resolve the apparent conflict between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT") regarding Plaintiff's shoulder impairments.[181] Because the Court is remanding the ALJ's decision regarding Plaintiff's left shoulder impairment, the Court does not address Plaintiff's allegation that the ALJ did not resolve the apparent conflict between the vocational

---

[177] A.R. 1214.

[178] A.R. 1222.

[179] *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir. 1996), *superseded by statute on other grounds,* 20 C.F.R. § 404.1529(c)(3), ("Without explanation, [the ALJ] ignored medical evidence of Smolen's other impairments and thereby erred.").

[180] A.R. 53.

[181] Docket 12 at 8.

expert's testimony and the Dictionary of Occupational Titles ("DOT") regarding Plaintiff's shoulder impairments.

### C. 12-Month Periods of Disability

Plaintiff asserts that the ALJ failed to consider all potential 12-month periods of disability.[182] Specifically, from September 2023 through July 2024, Plaintiff alleges that his knee, neck, and right shoulder impairments worsened or he underwent surgeries which required recovery time and follow-up appointments.[183] The Commissioner contends that Plaintiff is providing the Court with his alternative interpretation of the medical record, but the ALJ's conclusion should be upheld because it is supported by substantial evidence.[184]

In this case, the ALJ considered the evidence beginning with the amended alleged onset date of January 17, 2022, through the date of the decision, to determine Plaintiff was not disabled.[185] Consequently, Plaintiff's alleged worsening of his physical impairments, recovery from his surgeries, and attendance at follow up appointments is encompassed by the period considered by the ALJ.

The records pointed out by Plaintiff show that he ruptured his left knee anterior cruciate ligament ("ACL") in September 2023.[186] He underwent a cervical discectomy and fusion with cage replacement on February 12, 2024.[187] Plaintiff was scheduled for

---

[182] *Id.* at 11.

[183] *Id.* at 11–12.

[184] Docket 13 at 8.

[185] A.R. 27.

[186] A.R. 1050–51.

[187] A.R. 996–97.

ACL reconstruction surgery at the time of his neck surgery.[188] He underwent the ACL surgery about six weeks later, on March 28, 2024.[189] Plaintiff's physical therapist documented that Plaintiff's left knee ACL repair was healing nicely in the weeks following surgery on March 28, 2024.[190] The records noted by Plaintiff show that he used crutches on April 1, 4, 19, and 24, 2024.[191] Plaintiff's physical therapist also instructed him to use a brace "for at least six weeks for safety considerations or when [his doctor] states otherwise."[192] However, the August 6, 2024, record cited by Plaintiff for the proposition that he walked with a limp four months after surgery actually states that Plaintiff was "[w]alking *without* a limp."[193] On the whole, these records show Plaintiff recovered after his neck and left knee surgeries within 12 months.

The record from June 13, 2024, shows that Plaintiff had a full-thickness tear of the supraspinatus and infraspinatus tendons with severe myotendinous retraction and moderate fatty muscle atrophy in the right shoulder.[194] It is unclear whether this demonstrates a worsening of Plaintiff's right shoulder injury or if the MRI is simply objective evidence of the injury Plaintiff suffered after throwing logs a year earlier.[195] On April 29, 2024, Plaintiff presented with ongoing suspected kidney stone pain, but

---

[188] A.R. 1029.

[189] A.R. 1029, 1162–63.

[190] A.R. 1162–63, 1258, 1270, 1298, 1299.

[191] A.R. 1258 (Plaintiff also reported falling off a step ladder), 1270, 1297, 1304.

[192] A.R. 1270.

[193] A.R. 1222 (emphasis added).

[194] A.R. 1197.

[195] *See, e.g.,* A.R. 999 (throwing logs prior to calling 911), 1228 ("MRI was ordered but he can't afford to get to Anchorage for the test"), 1232 ("He has approval for the MRI for his shoulder but has not had it done due to transportation issues."), 1279 (still waiting for authorization for MRI).

ultimately refused an ultrasound and x-ray because he felt "he had waited too long" to be seen by the provider.[196]

Plaintiff also alleges that from August 2023 through July 2024, the number of medical appointments Plaintiff attended would not allow him to sustain full-time work.[197] However, attending medical appointments does not mean that Plaintiff would not be able to perform work on a regular and continuous basis.[198] And, "when there is no evidence in the form of a medical opinion that Plaintiff would frequently miss work due to medical appointments, and nothing to suggest that Plaintiff could not have scheduled [his] medical appointments outside of working hours," attending frequent medical appointments "does not amount to a medically determinable impairment."[199]

In sum, the ALJ considered all potential 12-month periods of disability.

---

[196] A.R. 1250.

[197] Docket 12 at 12.

[198] *See* 20 C.F.R. § 404.1545(b) & (c) (assessing physical and mental limitations to "determine your residual functional capacity for work activity on a regular and continuous basis"); SSR 96-8p, 1996 WL 374184 at *1 (July 2, 1996) (Work "on a regular and continuing basis . . . means 8 hours a day, for 5 days a week, or an equivalent work schedule."); *Goodman v. Berryhill,* No. C17-5115-BAT, 2017 WL 4265685, at *3 (W.D. Wash. 2017) ("[T]he Court rejects that frequency of medical appointments alone can be considered a disabling medical impairment. Accepting such a proposition would presume disability for anyone who frequently visited a doctor regardless of the necessity of the treatment or the medical prognosis.").

[199] *Alicia M. v. Comm'r of Soc. Sec.,* No. 2:21-cv-00433-REP, 2023 WL 2744135, at *6 (D. Idaho March 31, 2023), *citing Goodman,* 2017 WL 4265685, at *3; *see also Cherkaoui v. Comm'r of Soc. Sec.,* 678 Fed. Appx. 902, 904 (11th Cir. 2017) ("The number of medical appointments she attended is not a functional limitation caused by her impairments that would affect her physical or mental capabilities. Moreover, nothing in the record indicates that [claimant] was required, or would be required, to schedule her medical appointments during working hours so that they would interfere with her ability to obtain work.").

## SCOPE OF REMAND

Plaintiff asks the Court to enter judgment under sentence four of 42 U.S.C. § 405(g), reversing the SSA's final decision and remanding for the payment of benefits, or in the alternative, remanding for further proceedings, including a *de novo* hearing and a new decision.[200] The Supreme Court's "ordinary remand rule" applies in this case.[201] Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[202]

Having reviewed the ALJ's decision, the administrative record, and the parties' briefs, the Court concludes that the ALJ committed harmful error. In this case, the ALJ failed to provide specific, clear, and convincing reasons supported by substantial evidence for rejecting Plaintiff's symptom complaints regarding his psoriasis from the alleged onset date until March 2024 and failed to address Plaintiff's left shoulder impairment. Consequently, all of Plaintiff's functional limitations may not be included in the RFC and the Court cannot conclude that the ALJ's errors did not affect the "ultimate nondisability determination."[203]

However, because it is not clear from the record that the ALJ would be required to find Plaintiff disabled if all the evidence were properly evaluated, the remedy is reversal

---

[200] Docket 12 at 13.

[201] *Treichler*, 775 F.3d at 1099 ("The ordinary remand rule applies equally to Social Security cases.").

[202] *Treichler*, 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

[203] *Ford,* 950 F.3d at 1154 (citations omitted).

and remand to the SSA for further proceedings, including a new hearing and decision. On remand, the ALJ should specifically address Plaintiff's psoriasis before March 2024 and Plaintiff's left shoulder impairment during the alleged disability period.

**ORDER**

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error and are not supported by substantial evidence. Accordingly, IT IS ORDERED that Plaintiff's request for relief pursuant to sentence four of 42 U.S.C. § 405(g) at Docket 12 is GRANTED. The Court directs the Clerk of Court to enter judgment in favor of Plaintiff and close this case.

DATED this 9th day of September, 2026, at Anchorage, Alaska.

*/s/ Aaron Christian Peterson*
AARON CHRISTIAN PETERSON
UNITED STATES DISTRICT JUDGE